## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHELLE NYARKO,         *

     Plaintiff,            *

v.                        *        Civ. No. DLB-22-1141

DAVITA KIDNEY CARE, *et al.*,   *

     Defendants.         *

### MEMORANDUM OPINION

Self-represented plaintiff Michelle Nyarko filed a complaint against her employer, DaVita Kidney Care ("DaVita"),[1] and John Does 1 through 10, alleging disability discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* ECF 1. DaVita has moved to dismiss Nyarko's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. ECF 10. Nyarko has opposed the motion, ECF 14, and DaVita filed a reply, ECF 15. Nyarko moved for leave to file a surreply. ECF 16.[2] No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, the motion to dismiss is granted.

---

[1] The defendant states that the plaintiff incorrectly identified it as DaVita Kidney Care and that its correct name is Total Renal Care, Inc. ECF 10, at 1. Because the defendant refers to itself as "DaVita," the Court will too.

[2] "Unless ordered by the Court, surreply memoranda are not permitted to be filed." Loc. R. 105.2(a) (D. Md. 2021). A surreply, though "highly disfavored in this District," *Medish v. Johns Hopkins Health Sys. Corp.*, 272 F. Supp. 3d 719, 722 (D. Md. 2017) (citation omitted), is permitted when the opposing party raises an issue in its reply for the first time, such that the moving party would be unable to contest the matter without filing a surreply, *see Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). Nyarko claims that DaVita raised arguments about pay raises in its reply to which she needed to respond. ECF 16, at 1. Her motion for leave to file a surreply is granted, and the Court has considered her surreply.

## I.      Background

The Court accepts as true the following facts alleged in Nyarko's complaint and the exhibits attached to her complaint.  *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).  When the allegations in the complaint conflict with an exhibit, "the exhibit prevails."  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).  The Court summarizes Nyarko's primary allegations in this section and will supplement its analysis of her claims with additional allegations as appropriate.

Nyarko began working for DaVita, a provider of outpatient kidney dialysis services, as a social worker on May 26, 2020.  ECF 1, ¶ 15.  She alleges that before she was hired, she expressed her need for maintaining a stable work environment and her concerns about COVID-19.  *Id.*  She was informed that she would be working in two locations, Calverton and Glenarden.  *Id.*; *see also* ECF 1-3, at 4; ECF 1-5, at 2.  The Glenarden site was "exclusively treating COVID-19 patients from the regional cohort."  ECF 1, ¶ 15.  At the Glenarden site, Nyarko "was responsible for servicing the otherwise virus-free [Glenarden] patients."  *Id.*

On June 11, 2020, she was informed that she would be transferred to the Mt. Rainier location.[3]  ECF 1, at ¶¶ 15–16.  DaVita's regional director told Nyarko the transfer "was a 'operational decision' based upon [her] communicated concerns about contracting COVID-19."  ECF 1-5, at 3.  After Nyarko learned of the upcoming transfer, her training was paused and her contact with patients was limited, disrupting the stability of her work environment.  ECF 1, ¶¶ 15–16.  This triggered her anxiety, and on June 15, 2020, she requested an accommodation by email.

---

[3] In her complaint, Nyarko alleges that she was informed of the transfer on June 12, 2020, but a June 12 email attached to her complaint states: "[Y]esterday I was told otherwise.  I was informed, I was to be transferred to Mt. Rainer [sic] site."  ECF 1-4, at 2.  Another attached email states, "[O]n June 11, 2020, I was unilaterally advised . . . of my scheduled switch of my secondary from the Glenarden site to the Mt. Rainer [sic] site."  ECF 1-5, at 2–3.

*Id.* ¶¶ 16–17; ECF 1-5, at 1, 4.  In her email, which is not attached to her complaint, she "made [DaVita] aware of the full extent of [her] disability[.]"  ECF 1, ¶ 17.  DaVita followed up with Nyarko's treating physician on June 17, 2020, requesting more information.  ECF 1-5, at 6.  On June 24, 2020, Nyarko's work site was officially changed, which she alleges resulted in an increase in caseload and the necessity to work with two different supervisors.  ECF 1, ¶ 18.

Nyarko's physician completed the accommodation paperwork on June 26, 2020.  ECF 1-5, at 6–7.  Her physician reported that Nyarko had a permanent disability, "anxiety/depression and PTSD," and that Nyarko could not perform the essential functions of her position, namely "focusing and concentrating on work tasks to support patients."  *Id.* at 6.  As an accommodation, Nyarko's physician suggested that Nyarko be given "advance notice of work changes + new assignments, open communication with her team with possible written communication, ongoing access to needed equipment/supplies to perform needed duties."  *Id.* at 7.  Her physician added: "Due to underlying health issues, should not work at an identified COVID-19 site."  *Id.*  In a subsequent, undated letter, Nyarko confirmed her requested accommodations:

> (1) A transition plan; (2) Advanced notice of upcoming work changes and new assignments; (3) Improved communication, including involvement with the decision-making process for items such as scheduling as example, and written notices for items of important [sic] that may have before only been verbally set forth; (4) Consistent and continued access to equipment and resources required to carry out my duties; and (5) Improved transparency.

*Id.* at 4.

Nyarko alleges that her requests for reasonable accommodation were denied on July 10, 2020 "in a stigmatizing and dismissive response letter."  ECF 1, ¶ 20; *see also* ECF 1-5, at 8 (the letter).  The letter stated that DaVita would provide advance notice of work changes and new assignments and would encourage open communication with teammates, as Nyarko had requested.  ECF 1-5, at 8.  It also stated, "DaVita ensures that all teammates have access to equipment/supplies

to safely deliver patient care." *Id.* Finally, the letter confirmed that Nyarko was not assigned to a COVID-19 "cohort" facility and outlined the DaVita's processes for compliance with CDC guidelines and safety and infection protocols, although it noted that DaVita is "unable to ensure that teammate's [sic] are not working in a site that may have COVID patients." *Id.*

Nyarko responded by letter through legal counsel on July 20, 2020, offering to settle for $90,000 her potential legal claims against DaVita for discrimination and failure to accommodate her disabilities. ECF 1-5, at 13–14. She believes she had the highest caseload in the cohort, worked out of two-and-a-half locations, and a co-worker that replaced her at the Glenarden site was provided a COVID-19-related accommodation. ECF 1, ¶ 20. She also believes that DaVita had previously agreed to a reasonable accommodation that she would not work in a COVID-19 location but then "reneged on this promise." *Id.* ¶¶ 25, 28.

Nyarko made another accommodation request on February 4, 2021. ECF 1-5, at 36–38. She requested that her time for screening patients be limited to 30 minutes a day due to her pre-existing conditions that placed her at higher risk during the COVID-19 pandemic. *Id.* On February 18, DaVita sent a letter to Nyarko's doctor to obtain more information and explain DaVita's COVID-19 safety protocols. *Id.* at 53–54. On March 3, DaVita provided a letter to Nyarko explaining why it was not feasible to accommodate her request to limit her patient screening time to 30 minutes a day. *Id.* at 53–54. The letter noted that DaVita had received a response from Nyarko's physician on February 24. *Id.* DaVita explained that patients required in-person interaction to effectively communicate their needs and reiterated the strict safety and infection protocols in place to ensure staff safety. *Id.* The letter also explained that any COVID-19 patients were separated and confirmed that Nyarko was not working in a dedicated COVID-19 facility. *Id.*

Meanwhile, on February 19, DaVita issued a documented verbal warning to Nyarko that listed a series of performance concerns dated from October 29, 2020 through February 12, 2021. *Id.* at 39–42.  Nyarko acknowledged receipt of the documented verbal warning on March 9 in an emailed letter.   *Id.* at 44–47.   In her response, she referred to her previous requests for accommodation, which she stated were "ignored."  *Id.* at 44.  Regarding the alleged misconduct, she stated: "Though many of the Facility Manager's concerns/comments set forth in the Memo are baseless, I cannot help but wonder if either such concerns/comments (1) are retaliatory for my accommodation request and/or (2) could have been avoided if my accommodation requests were considered and granted."  *Id.* at 44–45.

On March 9, DaVita sent another letter to Nyarko's treating physician regarding her request to limit patient screening time to 30 minutes a day.  *Id.* at 62–63.  The treating physician responded on March 16, requesting that Nyarko's screenings be limited to 30 minutes per day starting February 22 and stating that "she is high risk due to her medical conditions during this pandemic [and] requires the remaining time to complete her other social worker duties."  *Id.*  On March 25, Nyarko sent an email to DaVita entitled "Accommodation Request Update," stating that her physician's office had faxed an updated accommodation request.  *Id.* at 58.  DaVita responded on March 25 and again on April 2.  *Id.* at 56–57, 64.  The April 2 email attached a letter from Nyarko's doctor that stated Nyarko was cleared to screen patients for more than 30 minutes a day if she is fully vaccinated against COVID-19.  *Id.* at 64.[4]  The email stated: "According to our records, you have been fully vaccinated.  Therefore, based on the guidance we have received from your doctor, you are medically capable of screening patients for more than 30 minutes per day."  *Id.*  The email also stated that Nyarko's concerns regarding retaliation would be forwarded to teammate relations.

---

[4] The letter in question is not included in either party's exhibits.

*Id.*  On April 23, the investigator who reviewed Nyarko's complaints spoke with Nyarko and emailed her to confirm the findings of her investigation. *Id.* at 65.  The investigator stated that she did not find that the documented verbal warning was retaliation or discrimination.  *Id.*

Nyarko filed disability discrimination complaints with the Maryland Commission on Civil Rights ("MCCR") on September 24, 2020 and April 21, 2021 and filed companion charges with the Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 26; *see* ECF 10-2 & 10-3 (MCCR charges).[5]  On February 9, 2022, the MCCR issued findings reports affirming that Nyarko had a qualifying disability but finding that DaVita was reasonable in its responses to her accommodation requests.  ECF 1, ¶¶ 28–33; *see* ECF 10-4 & 10-5 (MCCR reports).  Nyarko believes the findings were "contrary to previous legal findings and precedent[,]" "entirely erroneous[,]" and the result of her lawyer's failure to submit evidence.  ECF 1, ¶¶ 28–33.

On April 29, 2022, the EEOC adopted the MRCC's findings on two separate charges filed by Nyarko, closed the charges, and issued Nyarko a Right to Sue letter.  ECF 1-2.  Nyarko filed her complaint on May 11, 2022, asserting three causes of action under the ADA: (1) disability discrimination; (2) failure to provide reasonable accommodation; and (3) retaliation, including a retaliatory hostile work environment.  She seeks compensatory damages of $300,000, punitive damages to be determined by a jury, and costs and fees.  DaVita has moved to dismiss Nyarko's complaint under Rule 12(b)(6).

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted."  *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir.

---

[5] Nyarko does not dispute the authenticity of the related documents provided by DaVita, and the Court may consider them on a motion to dismiss.  *See Garrison v. McCormick & Co., Inc.*, No. JFM-10-298, 2010 WL 2651639, at *1 n.2 (D. Md. June 30, 2010).

2021) (quoting Fed. R. Civ. P. 12(b)(6)).  To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court.  *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A plausible claim is more than merely conceivable or speculative.  *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully."  *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)).  But the claim need not be probable, and the pleader need not show "that alternative explanations are less likely" than their theory.  *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader.  *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022).  But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."  *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)).  Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard."  *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)).  The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

When reviewing a motion to dismiss, a court "may consider the complaint itself and any documents that are attached to it," as well as any "document that the defendant attaches to its

motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations omitted).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  Accordingly, the Court must construe pro se pleadings liberally.  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021).  But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)).  Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

## III.   Analysis

Nyarko asserts claims of disability discrimination, failure to accommodate, and retaliation. At the pleadings stage in an employment discrimination lawsuit, a plaintiff is not required "to plead facts establishing a *prima facie* case of discrimination to survive a motion to dismiss." *McCleary-Evans v. Md. Dep't of Transp., State Hwy. Admin.*, 780 F.3d 582, 585 (4th Cir. 2015); *see Swierkiewicz v. Sorema*, 534 U.S. 506, 510–11 (2002).  Still, the Court must consider the elements of each claim to discern whether the plaintiff has stated a facially plausible claim.  *Iqbal*, 556 U.S. at 678; *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).  The Court addresses each claim in turn.

### A.  Disability Discrimination

The ADA forbids employers, such as DaVita, from discriminating against employees with disabilities.  *Tennessee v. Lane*, 541 U.S. 509, 516 (2004); *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 430 (4th Cir. 2015).  Title I of the ADA provides that no entity subject to the ADA's reach "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.  "To establish a claim for disability discrimination under the ADA, a plaintiff must prove '(1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'"  *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)) (internal quotation marks omitted)).  Nyarko has adequately alleged she has a disability.  And the Court will assume, without deciding, that she has sufficiently pled she is a qualified individual for the employment.  Her claim, however, fails at the third element because she does not allege an adverse employment action.

An adverse employment action must adversely affect the terms, conditions, or benefits of employment.  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).  Examples of adverse employment actions include discharge, demotion, decrease in pay or benefits, loss of job title or supervisor responsibility, or reduced opportunities for promotion.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).  Nyarko alleges that DaVita reassigned her to the Mt. Rainier facility a few weeks into her employment.  She claims this reassignment was an adverse action because she had

negotiated an assignment to a non-COVID-19 facility and the Mt. Rainier location treated a greater proportion of COVID-19 patients than other locations.[6]   A "reassignment with significantly different responsibilities" may constitute an adverse employment action.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  But the reassignment must result in "'*some significant detrimental effect*,' requiring more than a position that is 'less appealing' to the plaintiff."  *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (emphasis in *Laird*)).  For this reason, the Fourth Circuit and this Court have rejected discrimination claims premised on alleged discriminatory reassignment when the employee suffered no "'decrease in compensation, job title, level of responsibility, or opportunity for promotion[.]'"  *Holland*, 487 F.3d at 219 (quoting *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999)); *see also*, *e.g.*, *James*, 368 F.3d at 374–77 (holding reassignment to another role without any change in job title, pay, benefits, or other terms and conditions of employment did not constitute adverse employment action); *Hanning v. St. Joseph's Ministries, Inc.*, No. WDQ-14-3364, 2015 WL 9304538, at *7 n.20 (D. Md. Dec. 21, 2015) (holding reassignment that preserved the employee's position, schedule, responsibilities, salary, and benefits did not constitute an adverse employment action).  As in these cases, Nyarko does not allege that her reassignment resulted in any loss in pay, rank, benefits, responsibilities, or opportunities for promotion.  To the extent working with COVID-19 patients could be considered a "detrimental effect" of the reassignment for purposes of alleging an adverse employment action,

---

[6] Nyarko does not allege in her complaint that the Mt. Rainier site treated a greater proportion of COVID-19 patients.  She asserts that fact for the first time in her opposition.  A plaintiff may not amend the pleadings in an opposition brief.  *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).  Even if she had asserted this allegation, without more, it would not cure the pleading deficiencies.

Nyarko does not allege she treated or was required to treat patients with COVID-19 at the Mt. Rainier location.

Nyarko also alleges she worked at two-and-a-half locations and she had a heavier caseload than other social workers.  She does not provide details regarding her workload.  These are not adverse employment actions without plausible allegations that the increased workload and responsibilities were unreasonable or somehow affected the terms and conditions of her employment.  *See, e.g.*, *Boone*, 178 F.3d at 257 (stating that "modest stress not present in the old position" following a reassignment is not sufficient to bring a discrimination claim); *Taylor v. Burwell*, No. PWG-13-1998, 2014 WL 3547337, at *6 (D. Md. Jul. 16, 2014) ("[T]emporary changes to an employee's workload or to the tasks he is assigned do not constitute an adverse employment action."); *Hemphill v. ARAMARK Corp.*, No. ELH-12-1584, 2014 WL 1248296, at *11 (D. Md. Mar. 25, 2014) ("Plaintiff has failed to demonstrate that any increase in workload had a tangible effect on the terms and conditions of his employment, so as to constitute an adverse employment action.").

Even if Nyarko had alleged an adverse employment action, her claim still would fail because she does not allege specific facts from which the Court can plausibly infer that DaVita reassigned her to Mt. Rainier or increased her workload because of her disability.  She has not, for example, alleged any facts suggesting she was the recipient of disparaging comments about her disability or facts from which the Court could plausibly infer the existence of non-disabled comparators who received more favorable treatment.

Nyarko fails to allege a plausible claim for ADA discrimination.  Count I is dismissed.

### B.  Failure to Accommodate

Nyarko claims that DaVita failed to provide a reasonable accommodation for her disability. Employment discrimination under the ADA includes "not mak[ing] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).  To establish a *prima facie* failure to accommodate claim, a plaintiff must show that (1) she qualifies as an "individual with a disability" within the meaning of the statute; (2) her employer had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) her employer refused to make such accommodations.  *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015).  The applicable ADA regulation provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).  "'[R]easonable accommodation' may include . . . job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).  But the ADA does not require an employer to shift essential functions to another employee nor create "a modified light-duty position."  *EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 592–93, 595 (4th Cir. 2015).

Nyarko has adequately pled that she was an individual with a disability within the meaning of the ADA.[7]  She appears to allege three distinct instances of a failure to accommodate:  the reassignment to the Mt. Rainier facility; the failure to respond to her June 15, 2020 accommodation request; and the failure to respond to her February 4, 2021 accommodation request.  ECF 1, ¶¶ 15–17, 24–28, 31, 34, 44, 55.[8]

### 1. Mt. Rainier Reassignment

Nyarko alleges that before she was hired in May 2020, she expressed her need for a stable work environment and her concerns about exposure to COVID-19 due to the health risks posed by her underlying medical condition.  She claims that her "request was granted" but rescinded when DaVita announced her reassignment to Mt. Rainier.  ECF 1, ¶¶ 15, 25.

To allege a viable failure to accommodate claim based on the reassignment to the Mt. Rainier location, Nyarko must allege that DaVita was on notice of her disability and her need for an accommodation when it reassigned her.  "The burden to provide notice is not an onerous one:  the employee does not need to mention the ADA or use the phrase 'reasonable accommodation,' but need only inform the employer of *both* the disability and the employee's need for

---

[7] "The ADA defines disability as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 236 (4th Cir. 2016) (quoting 42 U.S.C. § 12102(1)).  In 2008, Congress amended the ADA to lessen plaintiffs' burden to show they are disabled under the Act. The ADA as amended provides that "an individual is regarded as having a disability 'if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 876 (4th Cir. 2020) (unpublished) (quoting 42 U.S.C. § 12102(3)(A)).

[8] Nyarko also alleges she requested and was denied a laptop computer.  ECF 1, ¶ 56.  To the extent she claims that denial was a failure to accommodate, she does not explain how it relates to her disability.  Rather, email correspondence attached to her complaint indicates she wanted a temporary laptop computer while her desktop was undergoing repairs.  *See* ECF 1-5, at 29.

accommodations for that disability." *Schneider v. Giant of Md., LLC*, 389 F. App'x 263, 270 (4th Cir. 2010) (citing *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 (4th Cir. 2008)).  Nyarko alleges that she expressed concerns about COVID-19 and her need for a stable work environment, but she does not allege that she identified her health conditions or otherwise explained what motivated her concerns.  Indeed, she alleges that she notified DaVita of "the full extent of [her] disability" on June 15, three days after DaVita announced the reassignment.  ECF 1, ¶ 17.  "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."  *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *4 (4th Cir. 1996) (unpublished table opinion)).  Nyarko has not sufficiently pled that she put DaVita on notice of her disability and her need for an accommodation before DaVita decided to reassign her to Mt. Rainier.

To the extent Nyarko claims that DaVita improperly went through with the transfer after she fully notified it of her disability and need for accommodation on June 15, the Court considers that claim as a part of her failure-to-accommodate claim arising from her June 15 request.

### 2.  June 2020 Request for Accommodation

Nyarko alleges that she requested an accommodation on June 15, 2020 after learning about her impending reassignment to the Mt. Rainier location.  Specifically, she requested "that the Respondent create a transition plan to aid in the work environment change[,]" and she alleges that DaVita "failed to acknowledge" her request "or engage in the interactive process at all."  ECF 1, ¶ 17.  This claim is belied by the exhibits Nyarko attaches to her complaint.

Nyarko's June 15, 2020 request for accommodation requested: "(1) a transition plan; (2) advanced notice of upcoming work changes and new assignments; (3) improved communication,

including involvement with the decision-making process for items such as scheduling as example, and written notices for items of importance; (4) consistent and continued access to equipment and resources required to carry out her duties; and (5) improved transparency." ECF 1-5, at 4. In response to the request, DaVita contacted Nyarko's treating physician. Nyarko's physician suggested that Nyarko be given "advance notice of work changes + new assignments, open communication with her team with possible written communication, ongoing access to needed equipment/supplies to perform needed duties." *Id.* at 7. Her physician added: "Due to underlying health issues, should not work at an identified COVID-19 site." *Id.* Ultimately, DaVita agreed to provide Nyarko accommodations:

> We are happy to provide you with advanced notice of work changes and new assignments. As well as encourage open communication with your team/teammates.
>
> Your provider also states that you need access to equipment/supplies to perform needed duties. DaVita ensures that all teammates have access to equipment/supplies to safely deliver patient care.

*Id.* at 8. Additionally, DaVita confirmed that Nyarko had not been transferred to a "cohort facility" with a disproportionate number of COVID-19 patients. *Id.* DaVita noted, however, that

> We are unable to ensure that teammate's [sic] are not working in a site that may have COVID patients. Facilities that have an isolation unit will still be treating PUI patients. If the patient tests positive then they are sent to be treated a cohort facility. Please note that DaVita is in compliance with CDC guidelines and has very strict safety and infection protocols. This includes only allowing essential teammates into the facility, screening all teammates when entering the facility which includes taking their temperature and general symptom checks. In addition, DaVita is requiring symptomatic and COVID-19 positive teammates to be out of work for a minimum of ten days. In addition, all teammates are required to wear PPE which may include surgical masks, gloves etc. while in the facility. DaVita also has effective cleaning measures that have been put into place. All of these measures have been put into place to ensure that our teammates remain healthy and safe while at work.

*Id.* Nyarko does not allege that she treated or was required to treat COVID-19 patients or that she was exposed to COVID-19 at the Mt. Rainier site.

Based on Nyarko's allegations, Da Vita did not fail to respond to her June 15, 2020 request for accommodations. Rather, Nyarko alleges that Da Vita engaged in the interactive process required by the ADA and agreed to provide her specific accommodations in line with her requests. Therefore, she does not allege facts that would allow the Court to infer that DaVita failed to provide reasonable accommodations in response to her June 15, 2020 request.

### 3. February 2021 Request for Accommodation

Nyarko also made a request for accommodations in February 2021. Through a letter from a medical provider, she asked that her patient screening time in the lobby, treatment floor, and patient areas be limited to 30 minutes a day. The basis for the requested accommodation was her "high risk due to her medical conditions during this pandemic." *Id.* at 62.

This failure-to-accommodate claim fails because Nyarko does not allege that her request to limit exposure to patients for 30 minutes for the entire day would allow her to perform the essential functions of a social worker. Indeed, Nyarko does not identify the essential functions of her job at all. In DaVita's response to the accommodation request, which Nyarko attached to her complaint, it stated:

> Social Workers must be able to meet with patients in-person throughout the workday on the treatment floor (and other clinic areas) and DaVita cannot limit your time to 30 minutes a day for a number of reasons. Many patients have communication barriers that preclude them from being able to fully and effectively communicate their needs and concerns unless they are able to meet with their Social Worker in person. Full and complete communication is very important to ensure the psychosocial needs of patients are addressed thoroughly. Relatedly, many patients show up for treatment with time-sensitive paperwork that they need their Social Worker to complete and sign so that they can submit it to other care providers. insurance companies. and waiver programs. Additionally, the

> treatment floor is a dynamic environment. Social Workers are often called upon to participate in impromptu, chairside discussions and care plan meetings with patients and other members of the IDT. Social Workers also need to be readily available if a frontline member of the treatment team (PCT and RN) has a question or concern about a patient.

ECF 1-5, at 53.  Nyarko does not take issue with DaVita's characterization of her job requirements or its conclusions that she could not perform the essential functions of her job with her requested accommodation.  As a result, she does not plausibly allege a failure to accommodate, and her claim is dismissed.  *See Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 623 (D. Md. 2014) (dismissing failure to accommodate claim because the plaintiff did not allege "even a cursory description" of his work and therefore failed to plead that he could perform the essential functions of his job with a reasonable accommodation).

### C.  Retaliation

Nyarko claims DaVita retaliated against her for requesting accommodations and filing an EEOC charge.  The ADA prohibits retaliation against "any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "To establish a *prima facie* retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action."  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

The range of adverse actions that may support a retaliation claim is broader than the range of adverse employment actions that may support an employment discrimination claim.  *Burlington*, 548 U.S. at 63.  Retaliatory actions "need not 'affect the terms and conditions of employment[,]'" but they do need "to be 'materially adverse'—such that they 'might have dissuaded a reasonable

worker' from engaging in protected activity." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Burlington*, 548 U.S. at 63–64, 68). "In other words, the harm must be a '*significant detriment*, not relatively insubstantial or trivial.'" *Laird*, 978 F.3d at 893 (quoting *Adams*, 789 F.3d at 431). Accordingly, this Court previously has ruled

> none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'

*Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted).

Nyarko alleges that DaVita verbally reprimanded her over a series of performance concerns, including providing intervention notes late, insufficiently detailed intervention notes, unprofessional behavior in meetings, and refusing to screen a patient. ECF 1, ¶ 34; ECF 1-5, 39–42. A verbal reprimand is not a cognizable adverse action because the harm resulting from it is relatively insubstantial and trivial. *See Thorn v. Sebelius*, 766 F. Supp. 2d 585, 598 (D. Md. 2011) (collecting cases). Nyarko does not allege that she suffered any significant detrimental effect from the verbal reprimand that would rise to the level of an adverse action necessary to state a retaliation claim.

Nyarko also alleges that she has not received a raise during her employment and that DaVita delayed conducting a performance evaluation that was a prerequisite for consideration for a raise. ECF 1, ¶ 67; ECF 1-5, at 67–68. But she does not allege that she was entitled to a raise. The failure to award a discretionary bonus or increase in pay is not an adverse action. *Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 531 (D. Md. 2004) (citing *Harrington v. Harris*, 118 F.3d 359,

366 (5th Cir. 1997)).  To the extent that she claims a delayed performance appraisal is itself an adverse action, that claim also fails.  The failure to issue a performance appraisal does not constitute an adverse employment action, *see Wonasue*, 984 F. Supp. 2d at 492, and Nyarko does not allege that she never received an evaluation, just that it was delayed.  Indeed, the associated email correspondence indicates DaVita hoped to reschedule the evaluation.

Because Nyarko has not adequately alleged an adverse action, the Court need not decide whether she has sufficiently alleged causation.  Her retaliation claim is dismissed.

### D.  Retaliatory Hostile Work Environment

Finally, Nyarko claims that DaVita subjected her to a retaliatory hostile work environment. "Retaliation claims . . . can be based on an employer's retaliatory creation of a hostile work environment." *Fordyce v. Prince George's Cnty.*, 43 F. Supp. 3d 537, 552 (D. Md. 2014) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *overruled on other grounds by Burlington*, 548 U.S. at 67–68); *see also Lewis-Davis v. Bd. of Educ. of Balt. Cnty.*, No. ELH-20-423, 2021 WL 4772918, at *15 (D. Md. Oct. 13, 2021) (considering retaliatory hostile work environment claim under the ADA).  A hostile work environment exists when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).  To state a retaliatory hostile work environment claim, a plaintiff must allege (1) she experienced unwelcome harassment; (2) the harassment was in retaliation for protected conduct; (3) the harassment was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive environment; and (4) there is some basis for imposing liability on the employer. *Lewis-Davis*, 2021 WL 4772918, at *15 (citing

*Wells v. Gates*, 336 F. App'x 378, 387 (4th Cir. 2009) (unpublished)); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).

The "severe or pervasive" element "has both a subjective and objective component." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond" the purview of the employment discrimination statutes. *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 21). When deciding the objective component of a hostile work environment claim, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[C]omplaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor . . . are not actionable[.]" *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (internal quotation marks and citations omitted).

Nyarko alleges that she was reassigned to a different facility in an attempt to reduce her exposure to COVID-19, that she did not like the reassignment or how it was handled, that she did not receive a raise due to a delayed performance evaluation, that she submitted two requests for accommodation, that DaVita engaged in an interactive process after she made the requests, that she was unsatisfied with the outcome, and that during the second interactive process, she was reprimanded for performance issues. This conduct, even when viewed in the light most favorable

to her, was not hostile.  Generally, "unfavorable personnel actions[] do not constitute a hostile

work environment."  *Carrico v. Prince George's Cnty. Gov.*, No. TDC-17-822, 2020 WL 1434102,

at *5 (citing *Perkins*, 936 F.3d at 208–09).  Nyarko also alleges that DaVita placed a "ringer"

device outside her office door.  *See* ECF 1-5, at 60–61.  She seems to allege that coworkers would

ring the device to get her attention when they needed to reach her, which she claims disrupted her

work.  This conduct is a far cry from intimidation, ridicule, insult, humiliation, or physical threat.

The Court cannot plausibly infer from these allegations that her coworkers' efforts to communicate

with her through a ringer outside her office door was harassment or in retaliation for protected

activity.  When all the conduct alleged in the complaint is considered as a whole, Nyarko does not

allege objectively severe or pervasive harassment that could support a retaliatory hostile work

environment claim.  *See Perkins*, 936 F.3d at 208.  The retaliatory hostile work environment claim

is dismissed.

## IV.     Conclusion

DaVita's motion to dismiss is granted because Nyarko has failed to plausibly allege claims

of disability discrimination, failure to accommodate, and retaliation in violation of the ADA.  The

complaint is dismissed.[9]  A separate order follows.


Date: March 31, 2023

_____
Deborah L. Boardman
United States District Judge

---

[9] Nyarko names John Does 1-10 as defendants.  The ADA applies only to "covered entities," which are "an employer, employment agency, labor organization, or joint labor–management committee."  42 U.S.C. § 12111(2).  Individuals, which presumably the John Does are, are not "covered entities" under the ADA.  *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (unpublished) (noting that the ADA does not provide for a cause of action "against defendants in their individual capacities") (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999)). The claims against the John Doe defendants are dismissed on this additional ground.